UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

IGNACIO DIAZ AGUILAR,

Defendant.

14-CR-0668

Statement of Reasons for Sentence
Pursuant to 18 U.S.C. § 3553(c)(2)

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.    Introduction ....................................................................................................................... 2
II.   Underlying Charge and Conviction ................................................................................... 4
      A.   Illegal Activity ........................................................................................................ 4
      B.   Arrest on Instant Charge ......................................................................................... 4
      C.   Guilty Plea .............................................................................................................. 5
      D.   Sentence .................................................................................................................. 5
III.  Context:  Parental Detention and Deportation ................................................................. 6
      A.   Statistics .................................................................................................................. 6
           1.  National ............................................................................................................ 6
           2.  New York .......................................................................................................... 9
      B.   Effects on Children ................................................................................................ 11
           1.  Psychological .................................................................................................. 11
           2.  Broken Families .............................................................................................. 15
           3.  Poverty and Its Attendant Risks ..................................................................... 17
IV.   Law .................................................................................................................................. 18
      A.   Imposition of Sentence .......................................................................................... 18
      B.   Offense Level, Category, and Sentencing Guidelines Range ................................ 19
      C.   18 U.S.C. § 3553(a) Considerations ..................................................................... 19
V.    Sentence ........................................................................................................................... 21
VI.   Conclusion ....................................................................................................................... 22

## I. Introduction

Defendant Diaz Aguilar entered this country from Mexico when he was twenty years old. He met his wife *here* two years later. Neither has papers. They had children *here*. The children are United States citizens. He was consistently employed *here* for fifteen years up until his arrest. He paid his income taxes *here* regularly. No criminal conduct other than this cause of conviction has been suggested. The crime charged appears to be a deviation from an otherwise legal way of life.

He has pleaded guilty to assisting in document forgery. The penalty of deportation is almost inextricably linked to this criminal conviction, with a corresponding effective restriction from ever re-entering this country. *See United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *3 (E.D.N.Y. Sept. 24, 2014) ("The 'drastic measure' of deportation or removal . . . is now virtually inevitable [as a result of] changes to our immigration law[s]." (quoting *Padilla v. Kentucky*, 559 U.S. 356, 360 (2010))). The dissolution of his family unit is a near certainty if general practice is followed by immigration authorities. The facts of this case lead to a recommendation of this court that the general practice of deportation *not* be followed.

A key role of a sentencing court is to reduce criminogenic factors present in society. *See* 18 U.S.C. § 3553(a)(2)(B) (there is a "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"); *see also* Craig Haney, *Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation*, 36 Hofstra L. Rev. 835, 857 (2008) ("[R]esearch confirms that traumas experienced earlier in someone's life—whether caused by structural forces like poverty and . . . parental . . . neglect—can be deeply 'criminogenic' (that is, persons exposed to them have a higher probability of subsequently engaging in crime)."). Its corollary responsibility is to ensure that its actions not create catalysts for criminal conduct by

family members.  The retributive collateral punishment of deportation that accompanies the vast majority of criminal convictions of non-U.S. citizens, *see Chin Chong*, 2014 WL 4773978, at *3, may create such a catalyst, *see infra* Part III.

This memorandum sets forth this court's policy regarding the issuance of recommendations to immigration judges adjudicating deportation proceedings of nonviolent noncitizens who have been found guilty of an illegal activity.

"Discretion remains an indispensable mitigating safety valve for the law's sometimes destructive and illogical effects."  *Id.* at *4.  Where credible evidence has been proffered demonstrating that deportation is likely to unreasonably traumatize United States-born children of a deportable criminal defendant, this court will issue a "non-deportation" recommendation to the immigration judge; where the defendant held a full-time job prior to his arrest, a work-release recommendation from detention will also be issued.  *See United States v. G.L.*, 305 F.R.D. 47, 48 (E.D.N.Y. 2015) (finding special circumstances may require deviation from general sentencing practice); *cf. United States v. Phillips*, No. 13-CR-631, 2015 WL 4629217, at *11 (E.D.N.Y. Aug. 3, 2015) (dismissing illegal reentry indictment premised on defendant's prior deportation resulting from aggravated felony conviction, and taking "particular" note of defendant's testimony and letters provided by his family "stating that deporting him would have a substantial negative effect on his children"); *Troxel v. Granville*, 120 S.Ct. 2054, 2060 (2000) ("[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this [nation].").

## II.    Underlying Charge and Conviction

### A.  Illegal Activity

Homeland Security Investigations ("HSI") and the New York City Police Department ("NYPD") witnessed defendant's direct involvement in the provision of fraudulent documents to a confidential source on eight occasions between March and December 2014.  *See* Presentence Investigation Report ¶¶ 3–31.  Although arguably induced by the informant, these were serious crimes.

The first transaction linked to defendant occurred on March 19 of 2014.  *Id.* at ¶ 4.  On this day, a confidential source arranged a meeting with defendant to seek a false passport, social security card, and permanent resident card.  *Id.* at ¶¶ 4–5.  The source provided defendant with biographical information, photographs, and a $100 down payment.  *Id.* at ¶ 4.  Two days later, the documents were exchanged for $1,900; the passport number provided was linked to a passport that had been issued in 2013 and that was reported lost or stolen.  *Id.* at ¶¶ 5–6.

One month later, on April 17, the source met with defendant again.  *Id.* at ¶ 7.  A down payment of $500 was made, and an additional $100 was paid directly to defendant, who allegedly insisted on receiving a cut of the money.  *Id.*  Two months later, defendant initiated contact with the source, informing the latter that he had the passport that had been requested in April.  *Id.* at ¶ 8.  He told the source that his supplier had additional passports, social security cards, and permanent resident cards available for sale.  *Id.*  Five more exchanges took place between defendant and the confidential informant.  *Id.* at ¶¶ 10–31.

### B.  Arrest on Instant Charge

On December 11, 2014, HSI special agents and NYPD officers executed a warrant at a residence (not defendant's) associated with the fraudulent documents.  *Id.* at ¶ 38.  They

recovered a printer, a computer, a document cutter, a laminator, United States passports, foreign passports, identification cards, and drivers licenses. *Id.* Defendant was arrested the following day for his involvement in the document forgery operation. *Id.* at ¶ 39.

### C. Guilty Plea

On March 20, 2015, defendant pled guilty to producing false passports in violation of section 1543 of title 18 of the United States Code. *See* Hr'g Tr. 19:25–22:17, Mar. 20, 2015, ECF No. 47; 18 U.S.C. § 1543 (providing that "[w]hoever falsely makes, forges, counterfeits, mutilates, or alters any passport or instrument purporting to be a passport, with intent that the same may be used; or . . . furnishes to another for use any such false, forged, counterfeited, mutilated, or altered passport or instrument purporting to be a passport, or any passport validly issued which has become void by the occurrence of any condition therein prescribed invalidating the same . . . [s]hall be fined under this title, imprisoned not more than . . . 10 years . . . or both"). He made a full confession.

### D. Sentence

Four months later, Mr. Diaz Aguilar was sentenced to time-served of seven months, and a supervised release term of three years. *See* Sentencing Hearing Transcript, July 16, 2015 ("Sent. Hr'g"). The proceeding was videotaped to develop an accurate record of the courtroom atmosphere—including reactions of his children, wife and others—as well as some of the subtle factors and considerations that a district court considers in imposing a sentence. *See In re Sentencing*, 219 F.R.D. 262, 264–65 (E.D.N.Y. 2004) (describing the value of video recording for possible review of sentences on appeal).

Both children sat with their father during the sentencing hearing. *See* Sentencing Hearing Videotape, July 16, 2015. When asked to speak, the youngest, ten, could not hold back his tears.

*Id.* His voice cracking, the boy explained to the court that he could not concentrate in school because he was always thinking about his father. Sent. Hr'g 15:17–21. Echoing his younger brother, the older brother, now age fourteen, dejected and visibly depressed, stated that he has been struggling in school ever since his father's incarceration. *Id.* at 14:24–15:3. The mother confirmed the defendant's good background as a father, spouse, and financial provider through legal work. *Id.* at 14:3–13.

## III.  Context:  Parental Detention and Deportation

### A.  Statistics

#### 1.  National

##### a.  Undocumented Migrants with United States Citizen Children

In 2012, the Pew Hispanic Center estimated that approximately 11.7 million undocumented migrants lived in the United States. *See Estimates of the U.S. Unauthorized Immigrant Population, 1990–2012*, Pew Research Center (Sept. 20, 2013), http://www.pewhispanic.org/2013/09/23/population-decline-of-unauthorized-immigrants-stalls-may-have-reversed/ph-unauthorized-immigrants-1-01/.



**Figure 1**
**Estimates of the U.S. Unauthorized Immigrant Population, 1990-2012**
*in millions*

Notes: Shading surrounding line indicates low and high points of the estimated 90% confidence interval. White data markers indicate the change from the previous year is statistically significant (for 1995, change is significant from 1990). Data labels are for 1990, odd years from 1995-2011 and 2012.

Source: Table 1, derived from Pew Research Center estimates based on residual methodology applied to March Supplements to the Current Population Survey for 1995-2004, 2012 and to the American Community Survey for 2005-2011. Estimates for 1990 from Warren and Warren (2013). See Methodology.

PEW RESEARCH CENTER

*Id.* Seventy-nine percent of their children, it has been reported, are United States citizens. *See* Jeffrey S. Passel & Paul Taylor, *Unauthorized Immigrants and Their U.S.-Born Children*, Pew Research Center 1 (Aug. 11, 2010), http://www.pewhispanic.org /files/reports/125.pdf.

In total, around 4.5 million United States citizen children live in families where at least one member is an undocumented migrant. *See* Jeffrey S. Passel & D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010*, Pew Research Center 13 (Feb. 1, 2011), http://www.pewhispanic.org/files/reports/133.pdf. They make up eight percent of the American newborn population and seven percent of the school-age population. *See* Passell & Taylor, *supra* at 1.

### b. Deportation Trends

The most recently available statistics compiled by the Department of Homeland Security indicate that, in 2013, the country deported approximately 438,500 documented and undocumented migrants. *See* United States Department of Homeland Security, *2013 Yearbook*

*of Immigration Statistics*, Office of Immigration Statistics at 103 tbl. 39 (Aug. 2014), http://www.dhs.gov/ sites/default/files/publications/ois_yb_2013_0.pdf.  The trend of both criminal and non-criminal deportations has increased steadily over the past decade and a half. *See* Mark Hugo Lopez & Ana Gonzalez-Barrera, *High Rate of Deportations Continue Under Obama Despite Latino Disapproval*, Pew Research Center (Sept. 19, 2013), http://www.pewresearch.org/fact-tank/2013/09/19/high-rate-of-deportations-continue-under-obama-despite-latino-disapproval/.



*Id*.  Of those deported between July 2010 and September 2012, 205,000 reported having at least one United States citizen child.  *See* Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Research Center (Nov. 2011), http://www.immigrationresearch-info.org/report/other/shattered-families-perilous-intersection-immigration-enforcement-and-child-welfare-system.

### c. Forced Separation of Families

It is estimated that over one million people in the United States, many of whom are United States citizen-children or spouses of noncitizens, lost a family member to deportation between 1997 and 2007. *See Forced Apart (By the Numbers): Non-Citizens Deported Mostly for Nonviolent Offenses*, Human Rights Watch (Apr. 15, 2009), https://www.hrw.org/report/2009/04/15/forced-apart-numbers/non-citizens-deported-mostly-nonviolent-offenses. Like defendant, seventy-two percent of them were not involved in violent crimes. *Id.*

On average, 90,000 parental deportations occur annually. *Id.* As in the instant case of this defendant, seventy-percent of individuals involved in formal removal proceedings have lived in the United States for more than ten years, the median length of residency being fourteen years. *Id.*

> [It is estimated that] there are currently 5,100 children in foster care that have either a parent detained . . . or a parent that has been deported, representing 1.25 percent of the total foster care population. . . . [I]f these rates continue through the next five years, at least 15,000 additional children will face threats to reunification with their detained and deported mothers and fathers.

Anita O. Maddali, *The Immigrant "Other": Racialized Identity and the Devaluation of Immigrant Family Relations*, 89 Ind. L.J. 643, 696 (2014).

### 2. New York

Eighty-seven percent of immigration cases involving noncitizens with children in New York result in deportation. *See New York University School of Law Immigrant Rights Clinic, Insecure Communities, Devastated Families: New Data on Immigrant Detention and Deportation Practices in New York City* 3 (July 23, 2012), http://immigrantdefenseproject.org/wp-content/uploads/2012/07/NYC-FOIA-Report-2012-FINAL.pdf. In New York, in 2010, Criminal Alien Program ("CAP") apprehensions—a nationwide mass deportation program

whereby United States Immigration and Customs Enforcement ("ICE") officials engage in the identification, arrest, and removal of priority aliens who are incarcerated—numbered close to 5,000. *Id.* at 4, 6. "The New York City criminal justice system has become a pipeline to immigration detention. Rapidly increasing numbers of immigrants are being swept into immigration detention and deportation after encounters with the criminal justice system." *Id.* at 2.



*Id.* at 6. Non-citizen New Yorkers are routinely transferred to another state to be held for deportation, even when their United States citizen children are resident New Yorkers. *Id*. at 13.



*Id*. at 14.

### B. Effects on Children

#### 1. Psychological

The significant and lasting pain young children and adolescents experience due to the loss of a parent is well-documented, especially when that loss is due to a parent's death or divorce. School systems, adult caregivers, family members and society at large tend to acknowledge the legitimacy of children's unique grieving processes, even when those processes include antisocial behaviors, such as acting out at school, withdrawing from friends or even getting into trouble with the law. The fields of child psychology, education and medicine have strived to develop effective interventions and support systems and to imbue these children with a strong sense of resiliency and the ability to cope.

*Less care has been taken, however, to address and acknowledge the trauma children experience as a result of the loss of a parent to prison.*

*See* Patricia Allard, *When the Cost is Too Great: The Emotional and Psychological Impact on Children of Incarcerating Their Parents for Drug Offenses*, 50 Fam. Ct. Rev. 48, 50 (2012) (emphasis added). Even less care is taken to address and acknowledge the trauma children experience as a result of parental deportation.

"The existence of deportation policies and practices has negative emotional, relational, financial, and academic consequences for . . . parents and children." Kalina Brabeck & Qingwen Xu, *The Impact of Detention and Deportation on Latino Immigrant Children and Families: A Quantitiative Exploration*, 32(3) Hisp. J. Behav. Sci. 341, 355–566 (2010); Brian Allen, Erica M. Cisneros & Alexandra Tellez, *The Children Left Behind: The Impact of Parental Deportation on Mental Health*, 24 J. of Child and Fam. Stud. 386, 386–392 (2015) (finding children with a deported parent were significantly more likely to display externalizing and internalizing problems than children whose parents were not deported or in the process of deportation). Consequences include feelings of abandonment, symptoms of trauma, fear, isolation, depression,

family fragmentation, and financial hardship. *See* Ajay Chaudry *et al.*, *Facing our Future: Children in the Aftermath of Immigration Enforcement*, The Urban Institute (Feb. 2010), http://www.urban.org/sites/default/files/alfresco/publication-pdfs/412020-Facing-Our-Future.PDF.

> The detention of a parent can create a state of crisis for the family, especially children, particularly because of the abruptness and lack of transparency that characterize the process. When detained, parents are typically not released pending deportation hearings, but rather, are held in detention as they await the hearing, leaving no time to see family or to make preparations . . . . Family members also can experience barriers to visiting loved ones in detention because of their own unauthorized status.
> . . .
> The nature of detention, which . . . often includes human rights violations, separation from family members, and the anticipation of permanent separation resulting from deportation and uncertainty regarding length, is regarded as a major contributing factor to mental deterioration, despondency, suicidality, anger, and frustration among detainees. . . . [A]n additional factor that contributes to the detained parent's stress is decisions that will need to be made regarding her or his U.S.-citizen children if the parent is deported.
>
> . . . Parents . . . must [often] decide whether it is better for children to remain with the parent, but with potentially limited access to health care and educational opportunities, or to remain in the United States with its array of opportunities and supports, but without one or both parents' present nurturing support.

Kalina M. Brabeck, M. Brinton Lykes & Cristina Hunter, *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. of Orthopsychiatry 496, 499 (2014) ("Brabeck I") (citations omitted).

Deportation can be expected to have a crippling effect on children and families.

> [It] often involves deterioration of the family members and of the community of those left behind. Studies are beginning to document the short- and long-term effects of detention and deportation on children and families of the deported individual.

This mounting empirical research has confirmed what social scientists, mental health professionals, and advocates have predicted, based partly on the much more established literature on the impact of parental incarceration on child and family well-being. In particular, this latter research has revealed that children with an incarcerated parent are 3 to 4 times more likely than those without an incarcerated parent to engage in delinquent behavior, and 2.5 times more likely to experience mental health problems.

When looking at long-term effects, children of incarcerated parents are more likely to have substance abuse problems and to be unemployed, and to experience poor romantic relationships, divorce, and/or separation from their own children. In the wake of parental incarceration, family members must deal with the sequela of traumatic separation, loneliness, stigma; how to explain the separation to children, strained parenting, reduced family income, unstable childcare arrangements, and home and school instability and transitions.

*Id.* at 499–500 (citations omitted).

Children from separated families are particularly susceptible to psychological harm. *See* Jonathan Baum *et al.*, *In The Child's Best Interest?: The Consequences of Losing a Lawful Immigrant Parent to Deportation*, University of California, Berkeley School of Law (Mar. 2010), https://www.law.berkeley.edu/files/Human_Rights_report.pdf (finding children who experienced immigrant parental separation suffer from behavioral challenges with respect to eating, sleeping and controlling emotions). Reports from clinical psychologists who met with affected families concluded that: "*[T]he level of post-traumatic stress disorder and anxiety rivaled that seen in war torn countries like Bosnia.* The kids can't concentrate, and are being mistakenly diagnosed as having behavioral problems when their symptoms are actually caused by stress, depression and anxiety resulting from [separation]." James D. Kremer *et al.*, *Severing a Lifeline: The Neglect of Citizen Children in America's Immigration Enforcement Policy*, A Report by Dorsey & Whitney LLP to The Urban Institute 70 (2009), http://www.dorsey.com/files/upload/DorseyProBono_SeveringLifeline_ReportOnly_web.pdf (emphasis added).

**TABLE 4.1. Children Experiencing Behavior Changes in Four Sites (Short-Term Interviews)**

| Age group | Eating | Sleeping | Crying | Afraid | Anxious | Withdrawn | Clingy | Angry or aggressive |
|---|---|---|---|---|---|---|---|---|
| 0 to 5 | 62% | 55% | 61% | 43% | 38% | 16% | 42% | 36% |
| 6 to 11 | 81% | 69% | 60% | 61% | 46% | 51% | 42% | 37% |
| 12 to 17 | 61% | 79% | 57% | 60% | 43% | 62% | 35% | 34% |
| All ages | 68% | 66% | 60% | 54% | 42% | 42% | 40% | 36% |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* The short-term interviews were conducted within six months of a worksite raid or other form of parental arrest. Data were collected on 133 children from 55 families in 4 sites—Arkansas, Miami, Van Nuys, and Postville. All changes were reported by responding parents or other adult caregivers, and the frame of reference for the changes is prior to parental arrest. The percentages exclude missing data and employ different denominators, ranging from 92 to 120 (out of 133 children).

Chaudry, *supra* at 42.  In the long-term, the more prevalent behaviors that children exhibited in the short term moderated, while "other behaviors that were less frequent during the short-term (withdrawn and angry/aggressive behaviors) persisted at the same or higher levels in the longer term."  *Id*. at 43.

**TABLE 4.3. Children Experiencing Behavior Changes in Six Sites (Long-Term Interviews)**

| Age group | Eating | Sleeping | Crying | Afraid | Anxious | Withdrawn | Clingy | Angry or aggressive |
|---|---|---|---|---|---|---|---|---|
| 0 to 5 | 39% | 30% | 48% | 21% | 7% | 17% | 56% | 18% |
| 6 to 11 | 56% | 46% | 52% | 35% | 35% | 54% | 63% | 56% |
| 12 to 17 | 29% | 53% | 35% | 55% | 31% | 67% | 38% | 56% |
| All ages | 43% | 41% | 47% | 33% | 23% | 43% | 54% | 41% |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* The long-term interviews were conducted at least nine months after a worksite raid or other form of parental arrest. Data were collected on 115 children from 52 families in 6 sites—New Bedford, Grand Island, Arkansas, Miami, Van Nuys, and Postville. All changes were reported by responding parents or other adult caregivers, and the frame of reference for the changes is prior to parental arrest. The percentages exclude missing data and employ different denominators, ranging from 55 to 77 (out of 112 children).

*Id*. at 43; *see also* Baum, *supra* at 9 ("A significant number of children . . . experience[] disruptions in their schooling[.]  [M]any miss[] school following their parent's arrest, some struggle[] to maintain good grades, and others consider[] dropping out of school.").

> Unlike separations involved in voluntary migration decisions, which may include economic benefits but social-emotional costs, *forced separation owing to deportation* incurred the social emotional cost without the economic benefit (in fact, economic situations typically deteriorate further following deportation). *Deportations involve a double or triple trauma for children*, who may witness the forcible removal of the parent, as they suddenly lose their caregiver and/or abruptly lose their familiar home environment.  From the attachment theory perspective, a child's

> sense of security is rooted in relationships with familiar caregivers; this secure base is a necessary foundation for developing social, cognitive, and emotional regulation skills that are fundamental throughout life. The physical separation between a parent and child, particularly when unexpected as in the case of deportation, disrupts this essential secure base, risking internalizing symptoms (depression, anxiety), externalizing behaviors (withdrawal, aggression), and social and cognitive difficulties.

Brabeck I, *supra* at 500 (emphasis added) (citations omitted).

Children experience a distorted perception of the events surrounding their parent's deportation, triggering negative psychological effects.

> Children whose parents are deported may experience confusion over whether their parent is a "criminal." They also may get the message that the loss should be kept a secret and receive confusing explanations about what happened, all of which compound the loss and increase the likelihood for adverse psychological effects. [U]nfortunate[ly,] while such adverse effects can be profound for children's development, they may not be considered "exceptional and extremely unusual hardship" under the current immigration policies.

*Id.* (citations omitted); *see also, e.g.*, Jacqueline Hagan, Brianna Castro & Nestor Rodriguez, *The Effects of U.S. Deportation Policies on Immigrant Families and Communities: Cross-Border Perspectives*, 88 N.C. L. Rev. 1799, 1804–05, 1818 (2010) ("After [the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of] 1996, the criterion for cancelling a deportation became 'exceptional and extremely unusual hardship' for the noncitizen's family.") (discussing how AEDPA's criterion actually exemplifies a disregard for adverse psychological effects of deportation on United States citizen children).

### 2. Broken Families

"[A] parent's deportation can lead to a permanent change in family structure and in extreme cases, family dissolution." Joanna Dreby, *How Today's Immigration Enforcement*

*Policies Impact Children, Families, and Communities*, Center for American Progress (August 2012).

Drawing on interviews with ninety-one parents and 110 children in eighty households, Joanna Dreby, a Professor of Sociology at the University at Albany, State University of New York, found that twenty-five percent of the families in her sample who experienced deportation were unable to keep the family together post-deportation. *Id.* at 10. As in the instant case, Dreby pointed out that when parental deportation results in a single parent household, it is often the mother, with her own tenuous legal status, who remains. *Id.* at 2. "One of the biggest fears that families expressed in interviews is that parents may lose custody of their U.S.-citizen children as a result of a detention or deportation." *Id.* at 10; *see also* Luis Zayas, *Forgotten Citizens: Deportation, Children, and the Making of American Exiles and Orphans or Exiling Children, Creating Orphans: When Immigration Policies Hurt Citizens* 170 (2015) ("Detained parents who are in ICE custody . . . are especially vulnerable to permanently losing their parental rights."); David B. Thronson, *Thinking Small: The Need for Big Changes in Immigration Law's Treatment of Children*, 14 U.C. Davis J. Juv. L. & Pol'y 239, 250–51 (2010) (suggesting immigration law is antagonistic to the needs of children because it, *inter alia*, has a "highly technical and restrictive definition of who qualifies as a child").

> As a result of the employment challenges and inability to fulfill the provider role, as well as the stigma, shame, and depressive symptoms, many deported fathers lose contact with their children in the United States. In this way, deportation severs paternal bonds, and forces many single mothers into very difficult positions as both family caretakers and providers.

Brabeck I, *supra* at 500. Often, the deported person was the sole financial provider for the household. *See* Chaudry, *supra* at 27. "For family members remaining in the United States, loss

of the deported person's income can lead to housing insecurity, food insecurity, psychological distress, and slipping from low income into poverty."  Brabeck I, *supra* at 501.

### 3.  Poverty and Its Attendant Risks

"A broad[] reason for the link between poverty and crime is the choice limiting effect of deprivation.  It is the capacity of poverty to limit choice, especially in a manner that inclines people to criminal behavior[.]"  Mirko Bagaric, *Rich Offender, Poor Offender: Why it (Sometimes) Matters in Sentencing*, 33 Law & Ineq. 1, 12 (2015); *see also, e.g.*, Amir Sariaslan *et al.*, *Childhood Family Income, Adolescent Violent Criminality and Substance Misuse: Quasi-Experimental Total Population Study*, 205 Brit. J. of Psychiatry 286–90 (2014) (finding children of low-income parents experienced seven-fold increased hazard rate of being convicted of violent crime as compared to peers of high-income parents); *see also* Jody Armour, *Nigga Theory: Contingency, Irony, and Solidarity in the Substantive Criminal Law*, 12 Ohio St. J. Crim. L. 9, 19–20 (2014) (explaining how the powerful urge to condemn people of color who are also poor induces the denial of collective accountability for the criminal consequences of poverty).

Splitting families with resulting impoverishment may increase the risks of future criminality of the children.  "[N]umerous studies . . . demonstrate a direct link between poverty and crime and consequently higher imprisonment rates for the poor."  Bagaric, *supra* at 6.

> The increased inclination toward crime resulting from disadvantage stems broadly from the lack of resources and opportunities that are *an almost unavoidable aspect of economic deprivation*.  Crime often results from frustration-aggression, which can stem from being subjected to inequality that is entrenched by poverty, poor schools, violent neighborhoods, racism, and single-parent families.  Further, it is established that poverty negatively affects the development of children, contributing to poor impulse control, low self-esteem, and reduced

educational achievements, all of which are conducive to harmful activity such as crime.

*Id*. at 10–11 (emphasis added).

## IV. Law

### A. Imposition of Sentence

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the Sentencing Guidelines referred to in section 3553(a)(4) of title 18 of the United States Code, the court shall indicate the specific reasons for imposing a different sentence. *See* 18 U.S.C. § 3553(c)(2). These "reasons must also be stated with specificity in the written order of judgment and commitment." *Id.* Even though the mandatory nature of the Guidelines has been excised and they are now "advisory," *United States v. Booker*, 543 U.S. 220, 245–46 (2005), the sentencing court must still adhere to the requirements of section 3553(c)(2) of title 18, *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006).

The court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under [section] 3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. United States,* 552 U.S. 85 (2007). Such a statement should demonstrate that the court "'considered the parties' arguments' and that it has a 'reasoned basis for exercising its own legal decision-making authority.'" *United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)).

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized. *See, e.g.*, 18 U.S.C. § 3553(a) ("The court shall impose a sentence

sufficient, but not greater than necessary . . . ."); National Research Council of the National Academies, *The Growth of Incarceration in the United States, Exploring Causes and Consequences*, 8 (2014) ("*Parsimony*: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

The prospect of deportation should be considered in sentencing. *See, e.g.*, *Chin Chong*, 2014 WL 4773978, at *13; *United States v. Perez*, No. 14-CR-0668-003, 2015 WL 4656550, at *3 (E.D.N.Y. Aug. 5, 2015); *Alli-Balogun v. United States*, No. 13-CV-07423, 2015 WL 4273786, *2 (E.D.N.Y. July 15, 2015); *United States v. Lopez*, No. 14-CR-668, 2015 WL 3938488, at *2 (E.D.N.Y. June 25, 2015); *United States v. Johnson*, No. 14-CR-464, 2015 WL 1966467, at *3 (E.D.N.Y. Apr. 29, 2015); *United States v. G.L.*, 305 F.R.D. 47 (E.D.N.Y. 2015).

### B. Offense Level, Category, and Sentencing Guidelines Range

Defendant's total offense level is 15. *See* Presentence Investigation Report ¶ 53. His criminal history category is I. *Id.* at ¶ 56. The Sentencing Guidelines ("guidelines") imprisonment range is 18–24 months. *See* U.S.S.G. Ch. 5 Pt. A.

A term of supervised release of not more than three years may be imposed. *See* 18 U.S.C. § 3583(b)(2). The guidelines range is one to three years. *See* U.S.S.G. § 5D1.2(a)(2).

A special assessment of $100 is mandatory. *See* 18 U.S.C. § 3013(a)(2)(A). Assessment of a fine is discretionary. *See* 18 U.S.C. § 1543. The fine range pursuant to the guidelines in $4,000 to $40,000. *See* U.S.S.G. § 5E1.2(c)(3).

### C. 18 U.S.C. § 3553(a) Considerations

The court considered the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Mr. Diaz Aguilar is thirty-seven years old. *See* Presentence Investigation Report ¶ 61. He was raised in below average economic circumstances. *Id.* at ¶ 63. Both his parents died when he was a young child. *See* Sent. Hr'g 18:22–24. His mother, a public restroom attendant, died when defendant was nine. *Id.* at 19:1–2; Presentence Investigation Report ¶ 61. After her death, his father raised defendant and his three siblings with the help of his late wife's brothers. *See* Presentence Investigation Report ¶ 63. The father paid minimal attention to the physical abuse inflicted on the defendant by his uncles, which included the repeated beating of defendant. *Id.*

Defendant did not continue his education past the seventh grade because his family was unable to afford the expense. *Id.* at ¶ 75. His father died when he was fourteen. *See* Sent. Hr'g 19:4–5. Orphaned, defendant and his siblings were separated, and raised by different relatives. *Id.* at 19:6–9.

In his early twenties, defendant immigrated to the United States without proper documentation. *See* Presentence Investigation Report ¶ 64. He immediately took a job at Scala Construction, in Queens, New York, receiving a weekly salary of $540. *Id.* at ¶ 78. He worked at the company full-time for ten years. *Id.* He held the title of supervisor during his last years at the company, earning a weekly salary of $720 when he left. *Id.*

In 2008, he started working part-time for another construction company, Escala, when jobs were available, and worked for Milan Church, a restoration company, as a carpenter and supervisor. *Id.* At Milan, his salary fluctuated between $700 and $750 per week. *Id.* Both companies praised defendant as a diligent and responsible worker. *Id.*

He met his wife in the United States when he was twenty-two.  *Id.* at ¶ 65.  The couple was married in the United States.  *Id.* at ¶ 65.  They have two sons, ages fourteen and ten; both were born in the United States.  *Id.* at ¶ 66.

Since his arrest, the children have been struggling in his absence.  *Id.* at ¶ 66.

Defendant has no history of illicit substance or alcohol abuse.  *Id.* at ¶ 74.

Today, defendant faces a likely deportation.  *See* Sent. Hr'g 13:10–12.  An ICE detainer has been lodged.  *Id.* at 5:3–6.

Any imposed further incarceration will cause trauma to defendant's children, imposing long-lasting negative effects on their lives.  *Id.* at 18:3–6.

## V.    Sentence

Under section 3553(a)(2)(B) of title 18, a sentencing court must consider two major factors: general and specific deterrence.

In light of the nature and circumstances of the offense, and the history and characteristics of the defendant, Mr. Aguilar Diaz was sentenced to time-served of seven months and a supervised release term of three years.  *Id.* at 18:4–5, 18:14–15.  A $100 special assessment was imposed.  18 U.S.C. § 3013(a)(2)(A).  No fine was levied and no restitution ordered because defendant does not possess substantial assets and is unlikely to possess such assets in the future.  *See* Presentence Investigation Report ¶ 82.

Two recommendations are made to the immigration judge assigned to Mr. Diaz Aguilar's case:  (1) that he not be deported; and (2) that he be provided with work release and permission to live with his family during his detention period.  *See supra* Parts I & III.

## VI.  Conclusion

General and specific deterrence are achieved by the sentence.  All relevant elements of the Sentencing Guidelines and statutes have been considered and respectful consideration was given to the Sentencing Commission's policy statements, and all other factors listed under section 3553(a) of title 18, to ensure that the sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).


SO ORDERED.

_____ /s/ Jack B. Weinstein _____
Jack B. Weinstein
Senior United States District Judge

Dated: August 14, 2015
        Brooklyn, New York